The United States Court of Appeals for the Ninth Circuit is now in session. Good afternoon. I'm Judge Gould and I'm presiding over this hearing. We have the case set for 20 minutes per side and Mr. Zappala represents appellants and he'll argue first. And Mr. Zappala, if you want to make a rebuttal argument, please try to save some of your time so you can use it on rebuttal. And Mr. Page, you're on board too, right? I am, Your Honor, yes. Good. Okay. Well, without further ado, we can start with Mr. Zappala's argument. Thank you, Your Honor. Good afternoon, Your Honors. Adam Zappala, may it please the Court, from Cachette, Petrie, McCarthy, on behalf of plaintiffs and appellants. I'd like to reserve four minutes of my time for rebuttal. Your Honors, I wanted to give you a brief overview of the trial court's errors and then sort of delve into each of those in a little bit more detail. The trial court committed three errors that require reversal. In the alternative, as we've suggested in our briefs, these issues could also be certified to the California Supreme Court for their view. First, the trial court erred in dismissing on a motion to dismiss plaintiff's tying claim premised on Qualcomm's undisputed policy of tying SEP licenses to their customers' purchases of chips. The trial court erred in construing the nature of competition in this tied market too narrowly and in a manner that conflicts with California law. The trial court also erred in dismissing the tying claim by over-relying on this court's holding in the FTC v. Qualcomm case, which construed federal instead of California law, as this case raises. In so doing, the trial court assumed that a California court would follow this court's highly controversial holding that Qualcomm's SuperFran licensing fee in violation of its standard-setting obligations and also obtained by leveraging its chipset monopoly is not an antitrust violation. That issue has never been squarely addressed by the California Supreme Court, but the California Supreme Court's reasoning in its Seminole-Cipro case suggests that it would not follow this court's decision in the FTC case. Counsel, Judge Gould, if I could interject a question. Isn't there a law generally that the state courts with their baby FTC and baby Sherman Act statutes will follow federal law in general? No, Your Honor. And in fact, many states have what are called harmonization statutes, which talk about how they would harmonize their state antitrust law with federal law. California doesn't have one. And in fact, a number of courts have held, including California courts and including the Ninth Circuit, that the Cartwright Act, which is California's antitrust statute, is, quote, broader and deeper in reach than the Sherman Act. This court held in AT&T Mobility, inciting the California Supreme Court case in Cianci, that the California Cartwright Act reaches antitrust violations in their incipiency as opposed to the Sherman Act. So the Cartwright Act has often been construed more broadly than the federal Sherman Act. And, you know, you can see that in different examples that aren't necessarily applicable to this case, but, for example, indirect purchaser standing, vertical price fixing, and the like. So, counsel, let me follow up on Judge Gould's question, because even if you're right that the California Cartwright Act is broader than federal antitrust, the Sherman Act, what about can you address more specifically the California cases in Morrison and Freeman and why those wouldn't lead to the conclusion that even under the Cartwright Act, the plaintiffs here have not shown a claim on... Because this issue is on summary judgment, right? Or, I guess, both, because you're saying part was dismissed on a motion to dismiss and part on summary judgment. That's right, Your Honor. The tying claim was dismissed by Judge Corley on a motion to dismiss, so obviously the allegations and the complaint have to be taken as true. The exclusive dealing claim was dismissed on summary judgment. So I think your question pertained to the tying claim. And that was obviously on a motion to dismiss. Okay, so let's discuss the tying claim. With respect to that claim, the plaintiffs had alleged, and it was undisputed, that Qualcomm had a so-called no-license, no-chip policy, and that is in order the person purchased chips from Qualcomm, O&Ms were required to take out licenses from Qualcomm. It's undisputed that Qualcomm had a monopoly position on the chips. So with respect to the licenses, Qualcomm required its customers to purchase those licenses and include it in those licenses were very onerous terms, which they were only able to extract from the… But, counsel, I mean I'm familiar with the allegations that you've made, but the district court, and I know you're taking issue with this, the district court said those allegations weren't enough. I thought the district court relied, correct me if I'm wrong, I thought the district court relied on the California cases of Morrison and Freeman to say that that was not enough under California law. So rather than, I mean I get the allegations, the question is are those allegations under Morrison and Freeman still enough to state a Cartwright Act claim? Yes, Your Honor, and here's why. The court construed competition in the tied market too narrowly, and here's why. What the court said was, well, the tied market, as you've alleged it, plaintiffs, is the SEP market, the market for standard and central patents. And because there's a patent, there can be no competition in that market. There's a patent that exists, it's closed over. That is error, and that's error under California law in the following way. It misunderstands the nature of competition in the patent market. That's why I backed up to just, and I'll tell you why. Yeah, because, I mean, it seems to me that what the district court said is exactly right, that the patent market is an exclusive monopoly. Now you're going to tell me why it's not. Oh, so you're disagreeing not only with the fundamental premise that a patent gives an exclusive monopoly. I thought you were going to go further and say even assuming that, the market still needs to be broader. No, the market is contestable. A patent is not inviolate. A patent is a limited grant, right? It can be challenged, and it often is. And, in fact, courts across the country spend a lot of their time dealing with such challenges. And here's what Qualcomm did, and this is classic time. Qualcomm took very weak patents that they self-declared were subject to the standard. They tied that to their chips and said, you don't have to sign these licensing agreements. And by the way, in doing so, you give up your right to challenge these patents. You give up your right to challenge the validity of these patents. You give up your right to even say that they're subject to the standard at all. You give up your right to argue that you're not infringing. You give up your right to argue that the patent hasn't been exhausted by the sale of the chips. That's what Qualcomm did. Now you could ask yourself, if a patent is all they needed, right, to have an established monopoly, why did they need these other concessions from OEMs? They needed them because Qualcomm, what they effectively did was they transformed weak patents in the standard essential setting process into unassailable, uncontestable patents. Okay, so let me back up because, I mean, that's an interesting argument that I hadn't appreciated the nuance of. So did you ever contest a patent? I mean, you wouldn't have had to sign the licensing agreement to contest a patent, right? Of course not. So then did you ever contest a patent, or did you make these allegations in the complaint to say these weren't legitimate patents? Yes, the allegations are contained throughout the complaint, and I can give you the record citation. Excuse me, just give me one moment to get there. Yeah, these are the paragraphs 2, 15, 55, 58, and 60, 76, 78 through 86. And this is in the complaint. This is, by the way, at 15 ER 3351, which is where plaintiff's complaints are. And the complaint alleges the nature of Qualcomm's weak patents and the fact that they leveraged their chipset monopoly to get unassailable, uncontestable patents. And here's why that's actually important. Okay, can I back up because I'm trying to follow the theory of this here because this does seem like a new theory that might not have been addressed previously, not to say that we can't use Cal, but it does seem a little bit different than Morrison and Freeman. Let's assume that these patents had been confirmed. By the way, have they been confirmed by anyone? Has anybody ever challenged the patents? Not to my knowledge, although it is significant that, I mean, this just shows you the coercive nature of the tie. I understand. But if the patents had been challenged and upheld as valid, would you still have a Cartwright Act claim or would your claim, because your claim seems to be based on the fact that these are weak patents, if the patents were shown to be sustainable and defendable, defensible, would you still have a Cartwright Act claim? I don't think so. That's obviously not the facts of this case, but there might be patent preemption type arguments there. But that's exactly, you're putting your finger on the error of the district court, which was to say, well, there's a patent here. Well, the question wasn't really asked, well, if that's all that it takes to lock up a market and get 100% monopoly, why would Qualcomm need these extra assurances from their OEMs? And here's, I just want to. Well, but counsel, even you can concede that there would be a lot of reasons to get these extra assurances. I mean, patents are challenged all the time. Legitimate patents are challenged all the time. And those challenges can be highly expensive and unsettling to the market. And so I don't think it's fair to say that just because they put that in means that they knew that they were weak patents. I think the question ultimately boils down to, were these weak patents? And were they leveraging weak, indefensible patents into a different market? Those are the clear allegations of the complaint. They have to be taken true on a motion to dismiss. That's what the complaint alleges. Whether we'll be able to prove that ultimately will be a question of proof. But this was thrown out at the motion to dismiss stage. That's exactly what the complaint alleges. And I think it's also really important, this is a quote from a noted antitrust scholar, Herbert Hugenkamp, and he's talking about the standard setting process, and I think there's a little bit of a disconnect, again, between the district court's holding and this aspect of how patents are set. And he says, this phenomenon of increased value for SEPs also motivates patent-owning firms to over-claim. That is, to assert that patents are standard essential when subsequent litigation or evaluation determines that they are not. While friend agreements require participants to declare relevant patents thought to be essential, the right of actual declaration far exceeds any rational boundary. As many as one-third to more than half of declared SEPs are likely not essential to the standard for which they were declared. In fact, overall infringement rates for SEP patents are not materially different from those non-SEP patents. And so, again, what we are alleging is that they leveraged weak patents by holding the chipset monopoly over the heads of the OEMs. That's the first manner in which they restrain competition in the tied markets. That's the first way in which the district court erred in dismissing our complaint on a motion to dismiss. The second way in which the court erred was in overly relying on this court's decision in the FTC case, which construed federal instead of California law, in the following way. We have also alleged that Qualcomm imposes, as part of the onerous licensing terms, a super-franned licensing fee. We allege that is a violation of their standard-setting obligation and, therefore, is harming competition in the tied market. The Ninth Circuit have found that Qualcomm's super-franned licensing fees, although a violation of their standard-setting obligation, sounded in patent or contract law and not in antitrust law. But there's every reason to believe that a California court would go the other way on this issue. And just being completely candid and open with you, this issue of violating one's standard-setting obligations and whether that constitutes an antitrust violation, it's hugely controversial. There are scholars on both sides of this issue. It is by no means a clear-cut issue. Reasonable minds can disagree on this issue. And, in fact, reasonable minds have disagreed. The district court judge originally presiding over this case, Judge Lucy Coe, went the other way on this issue and is now a member of this very court. And so the idea that a California jurist would – it's crazy to think a California jurist would find an antitrust violation here. Counsel, that's not the test. The test isn't, can we find a California jurist that would do this? The test is, what do we think, looking at California law, the California Supreme Court would do? And I'm trying to figure out what case you would point to to lead us in that direction. I'm so glad you asked that question, Your Honor. That was where I was going next. So, first, as reasonable minds, I think, can differ, that issue has engendered a lot of controversy. Second, the California Supreme Court has given us an indication that it would rule in our favor in this regard, and that's the California Supreme Court Cipro case. And, albeit, the court distinguished that case, the district court distinguished that case on the facts. It was a horizontal conspiracy claim. But what the important thing was about that court's decision there, the Supreme Court's decision there, was California correctly held, unlike the district court, that patents are not inviolate, that antitrust claims can be based on patents, especially where the defendant has abused their patent rights, as we've alleged here. We've alleged that Qualcomm abused their patent rights because they imposed a SuperFran licensing fee in the tied market, contrary to their standard-setting obligations. That restrains competition in the tied market. Okay. Counsel, but the question of a vertical versus a horizontal restraint seems to be pretty critical. So you sort of take the patent out of here and ask, would California recognize vertical restraints in ways that the federal antitrust laws would not? You know, what in Cipro tells us that California would recognize that? Well, first of all, the court didn't limit its holding in that way. It never said, oh, by the way, this analysis doesn't apply to other areas of our antitrust scrutiny, number one. Number two, you brought up the issue of horizontal versus vertical. A little bit off topic, but, you know, this is one area in which California law differs greatly from federal law. Under federal law, a vertical restraint is always reviewed under the rule of reason test. In California law, for example, vertical price fixing, that's subject to a per se claim. Totally different than federal law. So, you know, it's not at all clear that just because there's a vertical arrangement here, California would somehow depart from its Cipro decision and find that, well, it's okay for an entity to abuse its patent rights so long as it's in a vertical relationship. I'm not aware of any California authority that would militate in favor. Well, but it seems to me that you've got to come up with some California authority that, I mean, you're advocating for an antitrust context. You're saying that California would do that. And I'm trying to flesh out what is the case other than Cipro that would tell us that California courts would go this way. You know, do we, and this, and I want to ask this because of the timing here, because this sort of rolls into the certification question. Are there cases that would go both ways such that we would justify us certifying this to the California Supreme Court? Your Honor, I think the closest analogous case is Cipro, candidly. And I think you're absolutely right that that militates in favor of certification. Well, be clear. I'm not actually saying that. I'm saying you need to show us some conflicting law, as I read the law, to justify certifying this to the California Supreme Court. And I don't see conflicting law on this. Respectfully, that's not the test for certification. The test is that there is no precedent, right? And that's why the California Supreme Court needs to weigh in here. There is no controlling California Supreme Court precedent. So the federal courts would be forced into a situation where they would have to guess what a California Supreme Court would do under this fact scenario. I'm suggesting that the California Supreme Court would follow Cipro, right? But it's absolutely true. This set of facts has not ever hit the California Supreme Court. And that's part of our argument as to why it ought to be certified. And so I do see that I'm out of my time in terms of I'll reserve the rest for my rebuttal. I didn't have an opportunity to get to the exclusive dealing claim, which was dismissed at summary judgment. I'd be happy to do that on rebuttal. But I'll rest there for now. Thank you, Your Honors. Thank you, Your Honors. Good afternoon, Your Honors. Good afternoon, Your Honors, and may it please the Court. Gene Page, appearing on behalf of the appellee, Qualcomm. I'd like to start off just with what we just heard about the tying claim. I would just say that none of this about weak patents and so on and so forth is found in the briefs. You can take a look back at them. I don't think you'll find it there. I certainly didn't see it there. When you say look back at the briefs, you're talking about the appellate briefs or the lower court briefs? I'm talking about the appellate briefs. And I don't know that this was expressly raised in the district court either, but it certainly wasn't in either of the opening or the refineries. I want to ask about that because, I mean, there's two different ways we could skin this cat. One would be a waiver argument, which is what you seem to be arguing, advocating for. But let's say that we were able to, you know, look at that and we go back and read the complaint, the citations that appellate counsel just appointed us to and said, you know, look, the complaint does allege weak patents. We can consider that. Do you agree that the district court didn't deal with this specific argument about the weak patents versus just a patent generally? I'm not sure this argument was raised in the district court, so I'm not sure she did, Your Honor. But let me just kind of take a step back for a moment and answer a couple of questions you had. The first was have these patents been challenged? And the answer is yes. As you may know, there was litigation between Qualcomm and Apple around this time as well. Apple did challenge several of Qualcomm's patents, and, in fact, those challenges are continuing. And those patents would have been, I mean, it's hard for me to track all the different patents and what would be related to this case versus patents that would not be related to this case. But your position is all the patents that are directly related to this case have been challenged? Oh, no, Your Honor. I'm saying there are definitely patents that would be owned by Qualcomm. Qualcomm owns a number of patents, and those have been challenged by companies, including Apple. And some of those challenges are still ongoing today in the federal circuit. So I just wanted to make that factual. Well, yeah, but I don't know what relevance that has to this case. I don't know that it does, Your Honor, and here's why. All right. Here's why, because what we're hearing here is that there is some kind of effect in the market, in the so-called tied market. But let's look at what they've alleged and what the law requires. Under California law, like any antitrust law, you need to have a tying product and a tied product. Now, plaintiffs say the tying product is Qualcomm's chips and that the tied product are licenses to Qualcomm's standard essential patents. But the thing that you try to prevent with making tying unlawful is harming competition in the tied market. And there is no competition in plaintiffs' tied market. The only entity that can sell licenses to Qualcomm's SEPs is Qualcomm. There's no competition in that market, and so no competition can be harmed. Okay, forgive me. I may be totally off base here because I wasn't fully prepared for the nuanced argument that is being advocated here at Oral Argument. But the only reason you can say that is because you have a patent. I mean, anybody can get a patent on anything, and those patents may be valid or not valid. It can't be the case that you just go in and get a patent and say, okay, I've got a patent. Therefore, I have a monopoly. Therefore, you can't challenge me. And it turns out that you don't actually have any science behind this, and they're completely invalid. I'm not saying that's the case here, but your position seems to be based on the validity of those patents. No, Your Honor. Our position is based on the fact that there is no competition in the market. In other words, if you have, say, Samsung SEPs or SEPs held by Ericsson, those aren't substitutes for Qualcomm SEPs. You can't say I'm going to use Samsung's SEPs, and therefore I don't need Qualcomm's SEPs. Qualcomm's SEPs are unique assets that don't have a substitute in the SEPs of other companies because having an SEP from another company doesn't give you the right to practice Qualcomm's patents. You can practice that other company's patents. But, counsel, isn't the problem that if the patents were challenged and if the patents were not upheld, then Samsung could obtain a patent or could simply use the technology on its own if it was not patentable. So, I mean, doesn't this beg the question somewhat? Well, no, Your Honor, because the question here is what is the competition that's being restrained in the tied market, right? Who is the competitor that is being harmed here? And nowhere in their brief, in either of their briefs, did they say who the competitors were in this tied market because there aren't any. This supposed tied market doesn't have any competitors in it. Okay, so I want to make sure I understand your argument. So, because this is a little bit different than what the district court said. Because you have a patent, you have an exclusive right. Therefore, there's no competition in that market by virtue of the patent. You're now saying regardless of whether the patents are valid or not, the plaintiffs didn't allege separately that other companies either were or would have come into the market, but for the patents, and that's the deficiency. Yeah, I think, Your Honor, what the district court said was slightly different, which is that there are no rival sellers in that market, and that's true. There is no one else in the market that can sell a Qualcomm SEP. There may be people that can sell their own SEP. And that is regardless. So, your point is this doesn't really rise or fall on the patents. It rises or falls on the fact that no one else is in the market, and they didn't identify anybody else in the market. Exactly, Your Honor. But aren't they just going to say, well, of course there's nobody else in the market because there's a patent out there, and the patent scared everybody off, and we don't think those are valid patents. We've alleged that they're not valid patents, and if we're right that they're not valid patents, then there would be other market participants. But the point is, Your Honor, that they've defined the market as Qualcomm's SEPs. No one else has the right to sell those. I mean, that's their market definition. I think this goes to Judge Bidey's question, if I'm not mistaken, which is others would have the right to sell it if they weren't protected by a patent. Not sell the license to the patents, right? That's what they're saying the market is, the license to the patents, right? What they're saying is that no one actually wants to buy these things. They're saying that we are forcing people to take things they don't want, but that's not a tying claim. That is exactly like Belton versus Comcast, where someone didn't want to buy the basic tier of cable television to get the music or FM services, but that wasn't a tying claim because there was no other competitor in that market, no competition being restrained in that market for the basic tier of cable television, and they wouldn't have bought it anyway. Counsel, this is Judge Gould, if I can interject. I may be missing something, so correct me if I'm stating this incorrectly. But at least as I understand it, on the tying claim, the tied product is allegedly the licenses from Qualcomm, and since no one but Qualcomm can give those licenses, it seems like there's no competition in the market for the alleged tying product. That's exactly correct, Your Honor. There is no competition, and therefore no competition can be harmed, and therefore it can't state a tying claim. So that would be one basis on which that claim could be properly dismissed. That's also correct. Then also I have another point. Am I right that the alleged tying claim was not raised in the opening brief on appeal? I know there was a page counsel commented about whether it was raised in the district court complaint, but my question is, was it raised in the opening brief on this appeal? I think in the way it has just been framed at the beginning of this argument, no, it has not. I mean, I don't see anything about weak patents in the opening brief or the reply brief for that matter. But I do agree with what Your Honor said about that being the proper manner in which to dismiss the tying claim. And I just want to emphasize that is why Judge Corley dismissed the tying claim, because there is no competition to be restrained in the tied market, and therefore it was dismissed based on California law, standard principles of California law, under Morrison v. Viacom, under Belton v. Comcast. That's what it was dismissed under, not under the FTC decision. I mean, she was looking directly at cases where the allegations are such that there is no competition, no competitor and no competition being harmed in the tying market, whether because, I'm sorry, in the tied market, whether because there is no other seller in the tied market or because the buyers don't want what's being sold in the tied market. In either case, there's no competition. Let me ask. So you just said that the district court didn't look to our decision in FTC on this matter, but looked to California cases. Did it look to the California cases to see whether those cases departed in any way from our analysis in FTC? In other words, it looks to me like the district court's analysis comes out very sympathetic to FTC. Maybe she got there in a slightly different way, but it looks like it's the same analysis that we used in FTC. I would certainly say that Judge Cooley took FTC seriously as a matter of stare decisis. She understood that she was bound by the legal conclusions that were reached in that case, as Your Honors said that she would be, in your opinion on 23-F. But she didn't base her ruling on the FTC alone. She based it on the tying, on standard principles of California law for tying. Standards which the district court thought were the same as they were under the federal law. They absolutely are the same under the federal law, Your Honor. There is no case that plaintiffs have cited to where the tied market has no competition or no competitors in it. There's just, it's not there at all. And so that's true in Belton v. Comcast, 151 Cal. App. 4, 1224. Morrison v. Viacom, 66 Cal. App. 4, 534. And in the federal courts, Below v. Howland Realty, 574 Fed 310. Did the district court find any cases in which that analysis was present or that fact was present, that is that there was a claim of a tied market in which there were no competitors? No. In fact, she said quite the opposite. She said that the plaintiffs couldn't point to any. Yeah, but the fact that we can't point to anything, though, then does raise the question of what about certification. And it seems to me that the problem with certification is it really does feel like a bit of a collateral attack on our FTC decision. But as long as we hold open the possibility that California law is not the same as federal law, should we allow the California Supreme Court to weigh in on that question? No, Your Honor, because the rule is clear and consistent in all of the cases. Belton v. Comcast says it, Morrison v. Viacom says it, Below v. Howland Realty says it. If you don't have competition in the tied market, there is no tying claim. They haven't cited a single case in which there was no competition in the tied market and there was a tying claim. It's black-letter law that you can't have such a claim. Do you want to address briefly the summary? And it's a little unfair, not unfair, but I know appellants didn't have a chance to delve into the summary, the issues that were resolved on summary judgment, the exclusive dealing, right? Does that rely on the patent? Does that rely more on the patent? Because your position is the patent isn't really relevant to the unlawful tying. Whether there's a patent or not, there's no competition. But the viability of the patents is more related to the exclusive dealing claim, isn't it? I don't know that's the case, Your Honor. I mean, they are claiming that we entered into exclusive dealing arrangements with a couple of companies. I'll make two points there. The first one is that they claim that there's an exclusive dealing arrangement with Samsung and the district court found at 1 ER 12, page 12 of volume 1 of the ER, that there was no such term in the Samsung agreement and they haven't contested that really. They haven't made any comment on it in their reply brief. And then as to Apple, they are saying that they can sort of change up their theory from what it was before with the new declaration from Mr. Flamm. But, of course, Dr. Flamm's declaration was not permitted to come into the case because the expert discovery closed years before. Can I ask a little bit about that? I mean, number one, how important is Dr. Flamm's declaration? Because it seems to me that one way to resolve this case would be just to go to the merits and say, look, Flamm's declaration doesn't change the analysis on this exclusive dealing part that you've just addressed. The other one would be to say the district court didn't abuse its discretion on Dr. Flamm, which may also be true, but I am a little bit troubled by this idea that, you know, there's this intervening case law which comes out from our court in the FTC. We remand in the FTC case. We remand. It's not that crazy that plaintiffs would go back and revisit their case. And perhaps I know they had the opportunity. I mean, nothing would have prohibited them from putting in Dr. Flamm before. But say there's 10 issues, you know, and they didn't focus heavily on these last two issues. When it goes back, they're just left with these two issues, and they're like, now we want to develop it. Why wouldn't this court allow them to develop it and bring in Dr. Flamm? It does seem like he became much more relevant after we decided our FTC case than before. Well, let's unpack a few things there, Your Honor. First, nothing changed in the law of exclusive dealing from the FTC decision, right? There was no change whatsoever in exclusive dealing law. And the exclusive dealing claim has been in this case from the start. They had it in the consolidated amended complaint in 2017. They could have developed it as much as they wanted to. They chose instead to go with a theory that said all that the exclusive dealing does is exacerbate the effect of the so-called tie, right? So they chose to do it that way. Right. So your response to my hypothetical about, yeah, these might have been 9 and 10 on their list of importance, but they still didn't develop them. And just because 1 through 8 got knocked out doesn't mean you go get a second bite at the apple with 9 and 10. Precisely, Your Honor. It's more than just that. I mean, Dr. Flamm wasn't not in the case to begin with. He was in the case. And when we deposed him during expert discovery, we asked him, I asked him, whether prices of chips, he had an opinion whether prices of chips were too high, too low, or just right. He said no. He said no. And that is 14 ER 3289 to 90. And later on in the deposition, he talked about things he didn't explore. And he said exclusive dealing was one of those things. And that's the supplemental excerpts record at 7. So this is not just kind of coming in as something they could have come in with before. It's coming in with something they could have come in with before that contradicts. There's evidence to suggest they intentionally didn't develop it. I don't know about intentionally, but clearly the opportunity was there, and they didn't develop it. Precisely, Your Honor. They chose not to go with this. And certainly it's not an abuse of discretion, which both sides agree is the standard here for Judge Corley. Do you think it would be different if they hadn't raised these claims initially, and then once the core of their case was knocked out because of the FTC case, they amended the complaint and added these? Would that have been different? I don't know that would be possible, Your Honor, because you'd have to sort of add it well after the discovery had closed and everything was done. I'm not sure how you can add something when the case has gone that far down the track. That would be— Well, but they were allowed to amend their complaint. They were. They were. But they couldn't add new claims. Is that your position? I think that would be fair to say, Your Honor. It's not very just to add new claims after discovery is closed. Counsel, before all your time is gone, I'm going to use up some of your last minutes, but then I'll give you a little extra time if you need it. But my question is this. It's been a while since I went to law school, but at least when I studied antitrust law and practiced in it, my understanding was always that exclusive dealing agreements are not per se unlawful under the antitrust laws. And that while they may restrict competition in a particular brand that someone has an exclusive deal to sell, they may enhance competition between different brands because there can be other sellers of different brands. And so my question related to that, if that's the theory here that still applies on exclusive dealing, what, if any, was the competitive impact of the exclusive dealing arrangement challenged here? Well, Your Honor, I think there's kind of two things I'd like to say there. The first is that the arrangements between Qualcomm and Apple were helpful in terms of allowing Qualcomm to make investments into products that would be used for Apple. And so that's kind of a pro-competitive reason for the arrangements between Qualcomm and Apple. You needed to have some assurance that all of the work you're doing is going to come out at the end with some reward. And then second, in terms of the impact, I just want to make sure it's clear that Judge Corley was asking about whether there was a showing of foreclosure in both the CDMA and so-called premium LTE markets. And that's at 1 ER 14 to 15 where she said, I asked this. Plaintiffs couldn't show it to me. We pointed that out in our answering brief. They still haven't shown anywhere, even in the excluded flam report, where they have evidence of the foreclosure, supposed foreclosure, in both of the markets that they've pled. So even with flam in, they don't have the evidence to survive summary judgment. Thank you. Your Honor, I know that I have some limited time. I'm going to start out, I think, where we ended with exclusive dealing and this issue of Dr. Flom to address Judge Nelson's inquiry. We have to understand what happened here. Plaintiffs alleged four to five intertwined theories of antitrust harm at the district court level. Those were intertwined. Alcom said don't state cognizable theories of antitrust harm. The court said they do. So the pardons proceeded on the basis of an intertwined theory of antitrust harm. That radically changed when the Ninth Circuit said you can't, three of those four aren't cognizable, and in fact found that there was a failure of proof on the exclusive dealing claim. When it came to the district court, so the parties, of course, constructed their damages models, both the FTC and the private plaintiffs, based on an intertwined theory of antitrust harm. That was out after the FTC decision. We respectfully suggest that it was an abuse of discretion not to permit us to isolate damages arising solely from the exclusive dealing claim at that point. Counsel, was the question of the intertwined harms, is that something that you assumed or is that something that the district court limited you to? Was there anything that prevented you from saying we're going to proceed on two tracks here because we have two different statutes that authorize damages here. One is a federal statute, one is a state statute. The state statute is broader and deeper than the federal statute. So even if we lose on the federal statute, we're going to prevail on the state statute and we're going to proceed with two different things. Did you argue that? Not exactly in that way. And I think we're getting mixed up between federal and state. What I was arguing was that the antitrust theories of violation of liability, there were four of them, and those proceeded as a package. And they did so because the district court said, yeah, those state a claim. So the parties, we believe, are entitled to rely on the district court's decision about what the law of the case is. But, Counsel, you argued both federal law and state law, right? Correct. And did you break those out in your analysis of the violations in any way? Did you attempt to draw any distinction between the two? Because both federal and California claims were cognizable at that point, right? The district court had said those claims are cognizable. Those claims. Those sets of claims. And so we constructed damages models based on the intertwined theories. And then that situation changed later when this court, the Ninth Circuit, held that three of those four were not cognizable. And that's why we then need to. Counsel, I get your point. And I got to admit, I was a little bit sensitive to it. But I think at the end of the day, and maybe this is sort of where Judge Bybee is going, you could have developed these. I mean, there was nothing preventing you from doing it before. You're just saying we thought we already had it in this other bucket. We did develop them. Let's be clear. The fact evidence is all the same. We didn't reopen fact discovery. That can't be true that the evidence is all the same because Phlegm came in with new evidence that you're saying should have been acknowledged. New analysis based on existing evidence. All we did was say, okay, I put in a damage model before that calculated damages based on all four of these theories. Now here's the damage figure based solely on the exclusive dealing claim. Which we never said we had to do before that. And so, yeah, I mean, in order to do what you were saying, every combination of four intertwined theories I think would have resulted in something like 30 different damages models that we would have had to demonstrate. That doesn't make sense in light of Federal Rule 1. We were entitled to rely on the district court's holding. One other thing I'd like to raise is just that we believe sufficient evidence exists in the existing undisputed record putting aside the Phlegm report. I just encourage the judges to read the Einer Elhag report, both the initial report and the rebuttal. That report finds that Qualcomm's exclusivity agreements foreclosed competition. It finds that it cobbled Intel's entry into the market by more than two years, which was the big failing that the FTC court found. And it found this on CDMA chips and LTE chips, which was the issue that my opposing counsel just identified. With respect to waiver, this is now going back to the issue of weak patents on the motion to dismiss, sort of taking the first argument now second. That issue was raised below. Again, I just encourage the judges to read. Okay, but was it raised in your appellate briefs? Because, I mean, even I was a little bit caught off guard. Now, it doesn't mean I didn't miss something. It's possible. But I was not prepared for what you said at oral argument based on the briefing that you've given us. That suggests to me that it wasn't raised directly in your appellate briefs. Perhaps not directly. I mean, I thought that we had captured the concept in the following way. We were arguing that there had, in fact, been that kind of competition and that the court erred in that regard in construing competition so narrowly. The second way, and I know Qualcomm's counsel said this, that Judge Corley's only holding was that there was no competition in the tied market. That wasn't her only holding when it came to the tying claim. She also said, based on the FTC finding, that the mere imposition of a super-fran charge in the tied market in violation of the standard-setting obligations is not an antitrust concern, right? And that's based on the FTC Qualcomm decision. But we say a California court would come out differently on that because it's an abuse of the patent right. So that would be tantamount to restraining competition in the tied market. Now this issue of, well, only Qualcomm can use Qualcomm SEPs, again, that's just a super-narrow focus on what the market is. It'd be like saying, let's imagine a tie in the chicken market where, you know, you buy water and then you have to buy Foster Farms chickens, right? It's like Foster Farms saying, there is no market other than Foster Farms chickens because only Foster Farms makes Foster Farms chickens. There are other substitutable chickens. And so constraining the market in a way that creates a monopoly is sort of a circular reasoning, right, is to say, well, there can't be any competition for Qualcomm SEPs because only Qualcomm can have those SEPs. That is an exceedingly narrow definition of competition and one that we believe California courts would not accept. I think I'm out of my time, but I'm happy to answer any additional questions from the judges if they would indulge. Yeah, I have no questions. Thank you very much, Your Honors. Thank you, Counsel. Thank you, Your Honors. Okay, I think we heard from both counsel. Done excellent jobs. It's a challenging case. The case will now be submitted and the parties will hear from us in due course. Thank you, Your Honor. Thank you. Thank you, Your Honor.
judges: GOULD, BYBEE, NELSON